CONNECTICUT COKE COMPANY *v.* CITY OF NEW HAVEN

HOUSE, C. J., COTTER, LOISELLE, BOGDANSKI and LONGO, Js.

Argued October 9—decision released December 2, 1975

*William J. Egan,* for the appellant (plaintiff).

*Stephen G. Friedler,* with whom, on the brief, was *Roger J. Frechette,* corporation counsel, for the appellee (defendant).

COTTER, J.  In this action, instituted under General Statutes § 12-119, the plaintiff alleged that the amounts of the assessments on buildings and machinery it owned in the city of New Haven on October 1, 1967, were manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property.  It claimed a reduction in the amount of the assessments and reimbursement of the excess of taxes paid by it above those justly due.  The court found the issues for the defendant, except for a clerical error as to the valuation of one building which it directed the assessor to correct; concluded that the assessments were not manifestly excessive or arrived at by disregarding the valuation provisions of the statutes; and rendered judgment for the defendant from which the plaintiff has appealed.

In 1928, the plaintiff constructed a plant on land it owned in New Haven, which consisted of special purpose buildings and machinery designed to manufacture gas to be sold to public utilities.

On December 23, 1958, the plaintiff sold its land to two utilities but retained title to the buildings and machinery in question, and, on the same day, it leased back the land for a ten-year term ending September 30, 1968. The deed and lease were properly recorded on the New Haven land records, although no direct notice of this transaction was provided to the assessor.

In 1964, the defendant carried out its decennial property revaluation,[1] aided by a professional appraisal firm, the Cole-Layer-Trumbull Company (hereinafter the Cole Company). This revaluation, which helped determine the assessment of the plaintiff's buildings and machinery, was completed in 1964, adopted by the assessor, and used for the lists of October 1, 1964, through October 1, 1967.

In mid-1966, the plaintiff learned that its two customers, the New Haven Gas Company and the Connecticut Gas Company, would not renew their contracts, which ended on March 1, 1968, and July 31, 1968, respectively. The plaintiff thereupon ceased manufacturing gas on July 30, 1968, and the buildings in question were demolished and the machinery scrapped prior to October 1, 1968, the day after the plaintiff's lease on the land ran out and the day after the plaintiff filed this suit in the Court of Common Pleas.

I

The plaintiff vigorously challenges the conclusion of the trial court upholding the fixed depreciation method recommended by the Cole Company

---

[1] Such a periodic revaluation was mandated by General Statutes § 12-62.

and adopted by the assessor instead of utilizing a straight-line depreciation system over a ten-year period, as advocated by the plaintiff. It is the plaintiff's argument that the fixed depreciation method, which depreciated the buildings 76 percent and the machinery 60 percent instead of 90 percent in each case for the year in question, resulted in an assessment which was manifestly excessive.[2]

There is no mandatory formula for determining what is "manifestly excessive"; *National Folding Box Co.* v. *New Haven,* 146 Conn. 578, 585, 153 A.2d 420; *Sibley* v. *Middlefield,* 143 Conn. 100, 105, 120 A.2d 77; *Cohn* v. *Hartford,* 130 Conn. 699, 705, 37 A.2d 237; *Lomas & Nettleton Co.* v. *Waterbury,* 122 Conn. 228, 231, 188 A. 433; and in any assessment case, the trial court is confronted with conflicting accounting methods; giving credence to one over the other is a proper exercise of its function as a trier of fact. *Connecticut Light & Power Co.*

[2] For clarity of understanding, the computations used by the two experts follow: The Cole Company and the defendant found the total replacement value of the buildings and yards to be $10,761,110 as of October 1, 1964, and subtracted depreciations of roughly 45 percent to each building and 66 percent to the yards for a total of $4,018,730. (The exhibits make clear that when the parties refer to "buildings," they are including various yards on the property as well, i.e., improvements such as pier, stacks, fencing, railroad lines and asphalt paving. The figures used reflect this fact. Again, this description is not challenged by the plaintiff and thus is not subject to correction.) Another 30 percent depreciation was subtracted from $4,018,730 to reflect obsolete plant layout and economic conditions, thus leaving a total true market value of $2,813,110 on October 1, 1967. Of this total, one building and nine yards with a true market value of $623,970 are not in issue on this appeal. Thus, subtracting $623,970 from $2,813,110, we come to a fair market value of $2,189,140. Multiplying this sum by the city's uniform 60 percent rate leaves the assessment of $1,313,470, as the trial court found.

As to the machinery, the Cole Company and the defendant added figures provided by the plaintiff for a total original cost of $5,624,290. A flat 60 percent depreciation was then subtracted for

v. *Monroe,* 149 Conn. 450, 455, 181 A.2d 118; *National Folding Box Co.* v. *New Haven,* supra, 586. Under the facts of this case the trier was not in error in adopting the depreciation formula used by the defendant.[3]

Courts must be cautious in choosing between conflicting systems since "those calculations, although made in the best of faith, can lead to widely divergent results." *Burritt Mutual Savings Bank* v. *New*

a fair market value of $2,249,720; this amount, the replacement value, was assessed at a uniform 60 percent rate for an assessment of $1,349,850, as the court found.

The plaintiff's expert, by contrast, took the October 1, 1964 replacement cost of the buildings ($10,761,110, the same starting point as the defendant) and subtracted items with a useful life of more than ten years and on the site after October 1, 1967, and other items with a useful life of only ten years as of October 1, 1958, leaving a total replacement value of $8,327,736. Using this figure, he recommended straight-line depreciation of 10 percent per annum from 1958 through 1968. Since the year beginning October 1, 1967, was the tenth and final year, 90 percent depreciation was subtracted for a fair market value of $832,773, multiplied by 60 percent for an assessment of $499,664.

As for the machinery, the plaintiff's expert accepted the defendant's replacement value of $2,249,720 on October 1, 1964, and then multiplied it by 92 percent to obtain the replacement value as of October 1, 1958, i.e., $2,069,770. He then depreciated this replacement value by 90 percent for the year beginning October 1, 1967, for a fair market value of $206,977. This results in a 60 percent assessment of $124,186.

[3] In *Connecticut Light & Power Co.* v. *Monroe,* 149 Conn. 450, 181 A.2d 118, relied on by the plaintiff, the property, a dam, was depreciated on a straight-line method over the life of the dam, i.e., 100 years. During the tax year in question, the installation was thirty-seven and one-half years old, so that a depreciation of 37.5 percent was subtracted from the reproduction or replacement cost; id., 454. Instead of depreciating the buildings and machinery over their entire useful life, forty years in this case for the buildings, the plaintiff's expert advocated straight-line depreciation of 10 percent per annum for the years 1958 through 1968. The two methods yield different depreciation figures, and *Connecticut Light & Power Co.* v. *Monroe* cannot be read as requiring such a rapid and total depreciation during a fraction of the useful life of the property.

*Britain,* 146 Conn. 669, 674, 154 A.2d 608. At the same time, proper deference must be given to the judgment and experience of assessors. In reviewing valuations, "we must bear in mind that the process of estimating the value of property for taxation is, at best, one of approximation and judgment, and that there is a margin for a difference of opinion. . . . The law contemplates that a wide discretion is to be accorded to assessors, and unless their action is discriminatory or so unreasonable that property is substantially overvalued and thus injustice and illegality would result, their opinion and judgment should control in the determination of value for taxation purposes." Id., 675.

In substance, the plaintiff's expert's testimony as to the buildings is that adopting a 76 percent depreciation in 1967 is improper and manifestly excessive because the buildings were destroyed in 1968. Yet nowhere in his testimony is there an explanation of how straight-line depreciation of a forty-year-old plant over a ten-year span properly reflects obsolescence and impending demolition,[4] while the defendant's method, which assessed the buildings at 24 percent of their replacement value from 1964 until they ceased operating, does not reflect this fact. The acceptance or rejection of an opinion of a qualified expert, such as the plaintiff's witness, is a matter for the trier of fact unless the opinion is so unreasonable as to be unacceptable to a rational mind. *National Folding Box Co.* v. *New Haven,* supra, 586, and cases collected therein. We

---

[4] The plaintiff's expert witness took the 1958 replacement value of a plant built in 1928 and depreciated the total of the 1958 value over ten years. How depreciation for the first thirty years of the plant's life would be computed was not explored in the course of his testimony.

cannot find that the assessment respecting the buildings was so unreasonable under the circumstances of this case.

As for the machinery, the assessors allocated a maximum 60 percent depreciation since it was still income-producing and while it continued to operate its true value was considered to be a "floor" of 40 percent of the original cost. The average monthly inventory was shown to be $1,541,090 in 1964, and a comparable $1,399,921 in 1967.

The plaintiff's expert witness did not directly challenge the assessment practice that income-producing machinery had a floor of 40 percent of its original cost. As with the buildings, the plaintiff confined its attack to the proposition that the machinery should be depreciated 100 percent from 1958 to 1968, regardless of the useful life of the machinery. Again, a review of his testimony, compared with that of the other witnesses, leads us to the conclusion that the trial court did not act unreasonably in giving greater weight to their testimony and in finding that the defendant's assessments were not improper. Ibid.

There is no requirement, as the plaintiff seems to argue, that "fair market value" must somehow be related to market sales. When, as here, we deal with machinery which is not bought and sold in the normal marketplace, a test of fair market value which depends on operating use of the machinery is appropriate, and the court may properly find that such a method is the most appropriate system in an individual case. Ibid; see also *Somers* v. *Meriden*, 119 Conn. 5, 174 A. 184; *Underwood Typewriter Co.* v. *Hartford*, 99 Conn. 329, 122 A. 91. Thus, we cannot say that the trial court erred in adopting the defendant's depreciation system.

## II

We turn now to the second part of the plaintiff's argument, i.e., that the 1967 assessment "could not have been arrived at except by disregarding the provisions of the statutes regarding valuation."

### A

The gravamen of the plaintiff's claim on this point is that the 1964 revaluation was solely the judgment of the Cole Company, routinely adopted by the defendant on every grand list up to and including the 1967 list in question. It argues that this allegedly excessive reliance on the Cole Company contravenes three statutes: General Statutes § 12-62, which mandates that assessors shall "view . . . and shall revalue" all property every ten years; General Statutes § 12-64, which says that valuations of property such as the plaintiff's buildings are "to be determined by the assessors"; and General Statutes § 12-71, which requires assessors to value "goods, chattels or effects" such as the plaintiff's machinery at a percentage of their "actual valuation."

The legal issue arises because the statutes in question make no mention of expert appraisers such as the Cole Company; instead, they speak only of the "assessor" or "the assessors." This court has, on several occasions, discussed the degree to which experts such as the Cole Company may be relied upon in valuing property.

It has been consistently emphasized from as early as 1846 that the final approval of an assessment must "be the joint act of the board of assessors." *Middletown* v. *Berlin,* 18 Conn. 189, 197. Even

though assessors may employ expert assistance, a list will be valid only if the assessor or board of assessors reviewed all property and exercised their own independent judgment in valuing the entire list. *Cheney* v. *Essex,* 83 Conn. 493, 76 A. 1098.

A more precise description of the division of labor between assessors and experts was offered in *Conzelman* v. *Bristol,* 122 Conn. 218, 188 A. 659, cited as controlling here by both parties. In that case, the appraising company made a general survey of the real estate in the city and was closely monitored by the board of assessors. The company prepared unit values for the grand list, and these values were reviewed by the assessors. The company prepared cards for each taxpayer's property, and these cards were examined by the board of assessors, all of whom were familiar with most of the property in the city. Id., 223–25.

The assessments were upheld because they were "the acts of the assessors in the exercise of their own judgment rather than that of the company." Id., 225.

## B

In contrast with *Conzelman,* the evidence in the present case is far less detailed. We turn first to the trial court's conclusions regarding the assessment of the plaintiff's buildings. In order to show that the defendant has acted illegally under the standards of *Conzelman* and General Statutes §§ 12-62 and 12-64, the plaintiff has made an admitted "wholesale attack" against the findings, claiming that certain draft findings should have been admitted as undisputed or admitted, and that other facts were found without evidence or are of

such doubtful meaning that their real significance does not clearly appear. Cf. Practice Book §§ 627, 628.

Ordinarily such claims are determined on the basis of the appendices attached to the briefs. *Yale University* v. *New Haven,* 169 Conn. 454, 463, 363 A.2d 1108; *State* v. *Warren,* 169 Conn. 207, 213, 363 A.2d 91; *State* v. *Brown,* 163 Conn. 52, 55, 301 A.2d 547; *Brockett* v. *Jensen,* 154 Conn. 328, 331, 225 A.2d 190; *State* v. *Memoli,* 159 Conn. 433, 435, 270 A.2d 543; *Quednau* v. *Langrish,* 144 Conn. 706, 711–12, 137 A.2d 544. We have examined not only the evidence printed in the appendices, but also the transcript and exhibits. Although this court will ordinarily not comb the transcript to decide claims regarding the findings, such an examination is appropriate when, as here, the plaintiff has made a broad assault on the findings and when there is a need to reconcile and explain apparent discrepancies in the disparate portions of the testimony appended by the parties. Such a resort to the transcript is "especially necessary where the only two witnesses are the appraiser for the plaintiff and the assessor for the defendant town." *O'Brien* v. *Board of Tax Review,* 169 Conn. 129, 133, 362 A.2d 914; Practice Book § 628Q.

With respect to the buildings, the plaintiff has claimed that certain findings are vague and that the findings must be supplemented with certain draft findings which are claimed to be admitted or undisputed. We cannot agree. The addition of more facts would not serve any useful purpose or directly affect the ultimate facts upon which the judgment depends. *State* v. *White,* 169 Conn. 223, 242, 363 A.2d 143; *Novella* v. *Hartford Acci-*

*dent & Indemnity Co.,* 163 Conn. 552, 567, 316
A.2d 394; *Aetna Casualty & Surety Co.* v. *Murray,*
145 Conn. 427, 429, 143 A.2d 646.[5] We find no error
in the court's conclusion that the plaintiff failed
to meet its burden of proving an illegal assessment
of its buildings, and the findings would still support
this conclusion, even if they were to be altered as
the plaintiff has requested.

As our discussion of *Middletown* v. *Berlin,
Cheney* v. *Essex,* and *Conzelman* v. *Bristol* makes
clear, a challenge to an assessment as illegal will
succeed only if it is proved that the city assessor
has improperly exercised his judgment and knowl-
edge in revaluing and assessing property. The only
witness who testified regarding the plaintiff's
buildings was Walter Fletcher Johnson, an
appraisal technician for the assessor during the
time in question. Significantly, Johnson was not
the city assessor during the time in question, and
this is a critical distinction. The plaintiff has not
proved that Johnson's actions should be the sole
focus of an action under General Statutes § 12-119.
He was, in fact, merely an employee of the city
assessor, and the record fails to show that any lapse
in Johnson's performance of his duties was not
remedied by his superiors. The city assessor during
1967 was Thomas King, who was not called by either
party, even though his testimony was critical to a
finding of illegality.

---

[5] Because of our disposition of this case, we also decline to correct
the three findings challenged as found without evidence. Further-
more, as for the findings challenged as being of doubtful meaning
we conclude, on the basis of our review of all the evidence, as well
as the memorandum of decision, *King* v. *New Haven Trap Rock Co.,*
146 Conn. 482, 484, 152 A.2d 503; *Vitale* v. *Gargiulo,* 144 Conn.
359, 365-66, 131 A.2d 830; Maltbie, Conn. App. Proc. § 152, that they
are not so ambiguous that their meaning cannot be understood.

A major deficiency, among others, in this record is a failure to show what happened to Johnson's work after he finished it, how it was reviewed, by whom, under what criteria, etc. The findings and record indicate that the city of New Haven has a city assessor, instead of a board of assessors, who is charged with complying with the statutes regarding property valuation;[6] thus, it is his judgment and not the judgment of an employee, such as Johnson, which is the focus of General Statutes § 12-119.

The inferences the plaintiff would like to draw from Johnson's testimony are strongly undercut by a remark early in his testimony when asked if he kept in touch with the Cole Company during the revaluation in 1964. He answered:

"Yes. On this particular report, we kept in touch, in the general sense.

"We tried to review as much as we could and I didn't get into this in detail at any given time.

"Mr. King, who was City Assessor at the time, might have."

Since the plaintiff has to meet the "exacting test" of proving injustice and illegality, *Mead* v. *Greenwich*, 131 Conn. 273, 275–76, 38 A.2d 795; *Burritt Mutual Savings Bank* v. *New Britain*, 146 Conn. 669,

---

[6] See art. XXIII, § 86, charter, city of New Haven: "There shall be in the city a department of assessments consisting of a fulltime city assessor and such deputies, assistants and other employees as shall be provided by the ordinances. . . . [The city assessor] shall have all the powers and perform all the duties that now are, or hereafter may be conferred upon or required of tax assessors of cities and towns by the General Statutes or the ordinances." That a city may vest these powers in one assessor instead of a board of assessors is authorized by General Statutes §§ 9-196 and 9-198, and acknowledged by General Statutes § 12-62.

675, 154 A.2d 608; *Thaw* v. *Fairfield,* 132 Conn. 173, 179, 43 A.2d 65, we must regard the lack of evidence on how King exercised his judgment as fatal to the plaintiff's case. We cannot conclude that there was "misfeasance or nonfeasance by the taxing authorities, or [that] the assessment was arbitrary or so excessive or discriminatory as in itself to show a disregard of duty," *Mead* v. *Greenwich,* supra, 275; *Cohn* v. *Hartford,* 130 Conn. 699, 703–04, 37 A.2d 237; *State ex rel. Waterbury Corrugated Container Co.* v. *Kilduff,* 128 Conn. 647, 649, 25 A.2d 62; *Connecticut Light & Power Co.* v. *Oxford,* 101 Conn. 383, 391–92, 126 A. 1. Accordingly, we find no error on the part of the trial court concerning the assessment of the plaintiff's buildings.

## C

Similarly, with respect to the plaintiff's machinery, we find no error in the trial court's conclusion that it was not illegally assessed.

In his brief the plaintiff has not made a broad challenge to the findings relating to its machinery,[7] but has attacked only the conclusion of the trial court. "Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts. The court's conclusions are to be tested by the findings and not the evidence. *Hames* v. *Hames,* 163 Conn. 588, 592, 316 A.2d 379; *Hutensky* v. *Avon,* 163 Conn. 433, 437, 311 A.2d 92. Conclusions logically supported by the finding must stand. *Freccia* v. *Martin,* 163 Conn. 160, 164, 302

---

[7] The only challenge is to one finding, which it is claimed is so doubtful in meaning that its real significance does not appear. From our review of the appendices and transcript, we cannot agree, inasmuch as this finding is adopted almost verbatim from the testimony of the city's personal property assessor, Harry J. Cohen.

A.2d 280." *State* v. *Warren,* 169 Conn. 207, 213, 363 A.2d 91; *Yale University* v. *New Haven,* 169 Conn. 454, 464, 363 A.2d 1108. A review of the findings shows a more than ample factual support for the court's conclusions that the 1964 revaluation and the 1967 assessment were not illegally carried out.

The conflicting evidence on this point gave to the trial court a choice between two depreciation systems for determining valuation. Accepting one method over another was properly within the scope of its function as the trier of fact. *National Folding Box Co.* v. *New Haven, s*upra. Plainly, a dispute over the credibility of conflicting expert testimony is not the sort of illegality or assessor misfeasance or nonfeasance which General Statutes § 12-119 was designed to remedy. *Mead* v. *Greenwich,* supra. Accordingly, we find no error in the trial court's conclusions concerning the assessment of the plaintiff's machinery.

The trial court did not err in rejecting the plaintiff's claim that the assessments were manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of its property.

There is no error.

In this opinion the other judges concurred.